NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO, Plaintiff,

v.

COMMERCE TANKERS
CORPORATION,
Defendant-Counterclaimant,

and

Vantage Steamship Corp.,
Intervening Defendant.

VANTAGE STEAMSHIP CORP.,
Plaintiff,

v.

NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO, Defendant.

Nos. 71 Civ. 582, 72 Civ. 4619.

United States District Court,
S. D. New York.

March 31, 1976.

Abraham E. Freedman by Charles Sovel, Ned R. Phillips, New York City, for National Maritime Union of America, AFL–CIO.

D. David Cohen, Great Neck, N. Y., Marshall, Bratter, Greene, Allison & Tucker by James M. Bergen, Stephen B. Camhi, New York City, for Commerce Tankers Corp.

Surrey, Karasik, Morse & Seham by Fred C. Klein, Donald F. Devine, New York City, for Vantage Steamship Corp.

GRIESA, District Judge.

This is the final stage of litigation in these two consolidated cases involving National Maritime Union of America ("NMU"), Commerce Tankers Corporation, and Vantage Steamship Corp. The remaining matters to be covered relate to the counterclaims of Commerce against NMU in 71 Civ. 582 and the claims of Vantage against NMU in 72 Civ. 4619. These matters have been tried by the court without a jury. This decision constitutes findings of fact and conclusions of law.

### Prior Proceedings

This litigation grows out of an attempt by Commerce to sell its ship, the S.S. Barbara, to Vantage pursuant to a contract of sale dated December 23,

1970. The contract price was $2,750,000. At the time of this contract of sale, Commerce had a collective bargaining agreement with NMU covering the unlicensed personnel on Commerce's vessels. Article I, Section 2 of this collective bargaining agreement provided that if the employer sold any of its ships to a buyer who would operate under the United States flag, the ship should be sold with the complement of NMU employees, and that the employer would obtain from the buyer an undertaking that the NMU collective bargaining agreement would apply to the vessel.[1] Article I, Section 2 will sometimes be referred to as the "restraint on transfer clause."

The problem created by the proposed sale of the S.S. Barbara to Vantage was that Vantage's collective bargaining agreement for unlicensed seaman was with NMU's rival organization—Seafarer's International Union ("SIU"). Vantage did not intend to man the S.S. Barbara with NMU members, nor did Vantage give Commerce any undertaking that it would do so.

After learning of the proposed sale, NMU demanded enforcement of the restraint on transfer clause by way of arbitration, which was held before Arbitrator Theodore Kheel in New York City on February 8, 1971. The arbitrator found in favor of NMU and ordered that Commerce not transfer the S.S. Barbara to Vantage or any other purchaser without complying with the clause.

On February 9, 1971 the first of the actions in this court, 71 Civ. 582, was commenced by NMU against Commerce to obtain enforcement of Arbitrator Kheel's decision.

Vantage was thereafter permitted to intervene in this action. On March 2, 1971 Judge Frankel handed down a decision holding that a preliminary injunction should issue restraining the transfer of the S.S. Barbara in violation of the restraint on transfer clause. *National Maritime Union v. Commerce Tankers Corp.*, 325 F.Supp. 360 (S.D.N.Y.1971). The preliminary injunction was signed March 4, 1971. NMU was required to post a bond of $10,000. Commerce and Vantage appealed.

On May 24, 1971 the New York Regional Director of the National Labor Relations Board issued a complaint against NMU charging that the restraint on transfer clause in the Commerce-NMU collective bargaining agreement violated Section 8(e) of the National La-

---

1. Article I, Section 2 reads as follows:

"Section 2. Sale and Transfer of Vessels. (a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be agreed upon between the Union and the transferee. The term 'transfer' shall be construed to include any chartering of a vessel by the Company.

"(b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as hereinabove provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments thereto to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.

"(c) The Company agrees that if it desires to sell, bareboat charter or in any manner whatsoever transfer a vessel to another business entity, whether for United States flag or Foreign-flag registry, timely written notice to the Union must first be given prior to any such sale or transfer.

"(d) This Section shall be deemed of the essence of the Collective Bargaining Agreement and in the event of any violation, the no-strike provision of this Agreement shall not be applicable."

bor Relations Act, 29 U.S.C. § 158(e). On the same day the NLRB filed a petition in this court (71 Civ. 2300) asking for a preliminary injunction under Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*). The NLRB filed an amended petition on June 1 adding Commerce as a respondent.

On May 27, Commerce filed a motion in the District Court to vacate Judge Frankel's preliminary injunction in view of the NLRB charges.

Both the NLRB's § 10(*l*) motion in 71 Civ. 2300 and Commerce's motion to vacate in 71 Civ. 582 were heard by Judge Croake on June 4, 1971. On July 15 Judge Croake issued a decision denying both motions. *McLeod v. National Maritime Union,* 329 F.Supp. 151 (S.D.N.Y. 1971). Appeals were taken.

On March 22, 1972 the Second Circuit Court of Appeals reversed the rulings of Judges Frankel and Croake, holding that there was reasonable cause to believe that Article I, Section 2 of the NMU-Commerce collective bargaining agreement involved an unfair labor practice and that therefore a Section 10(*l*) injunction should issue. The Court of Appeals also held that, because of the filing of the NLRB complaint subsequent to Judge Frankel's preliminary injunction, that injunction should be vacated. *National Maritime Union v. Commerce Tankers Corp.,* 457 F.2d 1127 (2d Cir. 1972).

Unfortunately, by this time the proposal to transfer the S.S. Barbara to Vantage was dead, for reasons to be described hereafter. On May 1, 1972 Commerce sold the Barbara to Plaza Shipping, Inc. (an NMU contract company) for a greatly reduced price—$700,000.

Meanwhile, the unfair labor practice matter had been proceeding in the NLRB. On September 2, 1971 NLRB Trial Examiner Thomas F. Ricci filed a decision recommending dismissal of the complaint. On May 16, 1972 the Board issued its decision, reversing the trial examiner, and holding that Article I, Section 2 of the NMU-Commerce agreement was invalid because it violated Section 8(e) of the National Labor Relations Act. Upon the NLRB's petition for enforcement, in which Vantage intervened in support of the NLRB, the Court of Appeals (opinion of Judge Feinberg joined by Judges Lumbard and Friendly) upheld the NLRB's ruling. *NLRB v. National Maritime Union,* 486 F.2d 907 (2d Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

It is appropriate here to discuss this decision in some detail. Section 8(e) provides:

> "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: . . ."

The Court noted that Section 8(e) does not "shimmer with clarity" and that the question presented was "difficult to decide." *Id.* at 910, 911. The Court further noted that the primary purpose of Section 8(e) was to curb certain "secondary" labor activities. NMU argued that Article I, Section 2 was proper because it had the "primary" labor objective of preserving work for its members vis-a-vis Commerce and other NMU employers. However, the Court of Appeals held that the contractual clause went beyond "work preservation," and had an illegal secondary purpose of expanding NMU jurisdiction to non-NMU employers such as Vantage.

Concurrently with these proceedings in the federal courts and the NLRB, there was an arbitration and a state court proceeding involving Commerce and Vantage.

On February 10, 1971 Commerce demanded arbitration against Vantage on the December 23, 1970 contract of sale,

claiming damages for breach of contract. On March 29, 1971, in an action in Supreme Court, New York County, Justice Streit ordered arbitration. The arbitration commenced May 12. On July 9, the arbitrators awarded Commerce damages measured by the amount of the contract price for the S.S. Barbara—$2,750,000, plus other damages in the amount of $133,264, less the net proceeds to be realized upon the resale of the S.S. Barbara.

As already described, Commerce sold the Barbara to Plaza Shipping, Inc. on May 1, 1972 for $700,000.

On November 20, 1972 Justice Abraham J. Gellinoff issued a decision confirming the arbitration award. This was affirmed by the Appellate Division, First Department, on April 5, 1973. *Vantage Steamship Corp. v. Commerce Tankers Corporation,* 41 A.D.2d 813, 342 N.Y.S.2d 281 (1st Dept. 1973).

On October 30, 1972 Vantage commenced an action in this court (72 Civ. 4619) against NMU and Commerce. Among other things, Vantage alleged that NMU and Commerce had been guilty of an unfair labor practice and had violated Section 1 of the Sherman Act. This is one of the cases being dealt with in the present opinion.

On May 31, 1973 Vantage and Commerce concluded a settlement of all disputes between these parties. Vantage agreed to pay Commerce $700,000 in installments over a period of time. Commerce and Vantage exchanged releases in which there were express reservations of rights against NMU.

The net result of all these proceedings is that there remain for determination Commerce's claim against NMU for damages in 71 Civ. 582 and Vantage's claim against NMU for damages in 72 Civ. 4619.

*Contentions of Commerce and Vantage*

Commerce and Vantage claim that NMU is liable for damages under Sec-

tion 303 of the Labor Management Relations Act, 29 U.S.C. § 187, which provides:

"§ 187. Unlawful activities or conduct; right to sue; jurisdiction; limitations; damages

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

"(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."[2]

Section 303 authorizes a suit for damages where there has been a violation of Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). The relevant passages in Section 8(b)(4) are as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*    \*    \*    \*    \*    \*

"(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

"(B) forcing or requiring any person to cease using, selling, handling,

---

**2.** Originally Commerce and Vantage contended that they would be entitled to damages under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. However, this section relates to suits "for violation of contracts between an employer and a labor organization." Neither Commerce nor Vantage is suing NMU on such a cause of action.

transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . ."

█ The references to "subsection (e) of this section" is the Section 8(e) which was found to have been violated by the Court of Appeals in its opinion in the NLRB proceeding. 486 F.2d 907. As already described, that court held that Article I, Section 2 of the NMU-Commerce agreement was a violation of Section 8(e). However, the *mere making* of a contract which violates Section 8(e) does not in and of itself give rise to a cause of action *for damages*.

It is only where the *added* elements of Section 8(b)(4) are found to exist that a cause of action for damages accrues. For instance, the latter section would be violated where a labor union *threatens, coerces* or *restrains* an employer with the object of *forcing* or *requiring* the employer to enter into the Section 8(e) agreement. Similarly, Section 8(b)(4) would be violated if a labor union threatens, coerces or restrains an employer in order to force or require him to cease doing business with another party.

Commerce and Vantage claim that NMU violated Section 8(b)(4) in that (1) NMU coerced Commerce into entering into the collective bargaining agreement containing the Article I, Section 2 provision which violated Section 8(e); (2) that NMU coerced Commerce, and forced Commerce to cease doing business with Vantage, and forced a prospective charterer to cease doing business with Vantage—such coercion and force being the strike threat contained in Article I, Section 2; (3) NMU restrained Commerce, and forced Commerce to cease doing business with Vantage, by obtaining the preliminary injunction from Judge Frankel.

Commerce and Vantage further contend that NMU is liable under Section 1 of the Sherman Act. In the first place, Commerce and Vantage urge that there is no labor law exemption from antitrust liability here, citing *Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Vantage and Commerce then contend that NMU has Sherman Act Section 1 liability on the following related but somewhat different theories: (1) That the restraint on transfer clause involved a group boycott against certain potential purchasers of vessels and therefore constituted a *per se* violation; and (2) that the sale and transfer clause was the result of a combination or conspiracy between NMU and large shipping companies to enhance their competitive and financial position at the expense of smaller companies such as Commerce.

Commerce and Vantage also rely upon certain common law theories. They contend that NMU wrongfully induced the breach of the contract between Commerce and Vantage for the sale of the S.S. Barbara. Commerce and Vantage also contend that NMU is liable for obtaining a "wrongful injunction"—*i. e.,* the preliminary injunction issued by Judge Frankel.

Vantage claims that Article I, Section 2 violated New York General Business Law § 340, known as the Donnelly Anti-Trust Act.

The amounts of damages (before any trebling based upon the Sherman Act theory) are claimed to be as follows. Commerce claims that it is entitled to a total of $1,550,000, calculated by taking the contract price for the S.S. Barbara ($2,750,000) and subtracting the amount realized upon the resale to another purchaser ($700,000) and further subtracting the amount received from Vantage in the settlement ($700,000), giving a net total of $1,350,000, to which is added the costs of holding the S.S. Barbara after it was supposed to have been delivered to Vantage ($200,000). Vantage claims a total of $2,230,000, consisting of loss of profits on a charter it had for the S.S. Barbara with Standard Oil of California—the alleged profits being $1,500,000; amounts invested by Vantage in repair of the S.S. Barbara ($30,000); and the

amount paid to Commerce in the settlement ($700,000).

### Contentions of NMU

NMU denies the validity of each of the above theories. In addition NMU asserts certain affirmative contentions. NMU urges that the only action it took to enforce Article I, Section 2 was to obtain an arbitration award, and then sue in this court to enforce that award. NMU contends that it was the preliminary injunction of Judge Frankel in this lawsuit which prevented the consummation of the sale of the S.S. Barbara to Vantage and the fulfillment of the charter which Vantage had obtained for the vessel. NMU argues that Commerce and Vantage did not pursue available remedies in the Court of Appeals in a timely or appropriate manner. NMU contends that its liability, if any, is limited to the amount of the $10,000 bond posted for the preliminary injunction.

NMU also urges that the settlement of the mutual claims of Commerce and Vantage operates as a bar to any recovery by either of these parties against NMU.

### Further Facts

### Background of Article I, Section 2

A substantial part of the evidence in this case relates to the contention of Commerce and Vantage that the restraint on transfer clause (Article I, Section 2) of the NMU-Commerce collective bargaining agreement was the result of a joint effort by larger shipping companies to somehow prejudice the smaller companies and reduce competition.

Commerce and Vantage contend that the large companies were attempting to inhibit free transfer of vessels so as to keep the contributors to the union pension funds "bound into the contributing group" (Commerce Post-Trial Brief p. 28). Moreover, Commerce and Vantage contend that the large companies were attempting to reduce competition in certain trade carried on by United States flag vessels.[3] Commerce and Vantage allege that, since Article I, Section 2 imposed its restrictions only upon sales to a United States flag operator, the result would be to encourage sales to foreign flag operators thus reducing the number of United States flag vessels.

There is no direct evidence that these alleged purposes were discussed or agreed upon by the larger companies. Commerce and Vantage assert that their claims of combination or conspiracy on the part of the larger shipping companies are proved by circumstantial evidence about the background of the collective bargaining agreement in question, and about the methods used in negotiating this agreement.

In the United States maritime industry there are separate unions representing the unlicensed seamen, the engineers, the deck officers and the radiomen.

There are competing unions for the different categories of personnel—an example being the NMU and SIU rivalry respecting unlicensed seamen. In one segment of the United States shipping industry the companies have contracts with a particular line-up of unions, as follows:

| Category | Union |
| --- | --- |
| Unlicensed seamen | NMU |
| Engineers | Marine Engineers Beneficial Association ("MEBA") |
| Deck officers | Masters, Mates and Pilots ("MMP") |
| Radiomen | American Radio Association ("ARA") |

Among the shipping companies having contracts with this group of unions—NMU, MEBA, MMP and ARA—are companies who have formed certain committees to act together in bargaining with the unions. One such committee is the Tanker Service Committee ("TSC"), which represents certain large tanker op-

---

**3.** United States intercoastal trade and certain other trade has been limited by law to United States flag vessels.

erators. The other committee is the Maritime Service Committee ("MSC"), which represents certain non-tanker operators. For many years a lawyer by the name of Edward Silver has represented both the TSC and the MSC in negotiations with these unions.

Many companies other than members of the TSC and the MSC have collective bargaining agreements with this set of unions. These other companies have been referred to in this action as the "independents." Commerce was such an "independent" tanker company, operating two tankers. Although the independents are not represented by the TSC and MSC in any legal sense, the independents have in practice generally acquiesced in the agreements worked out by the committees.

In 1961 or thereabouts NMU, MEBA, MMP and ARA entered into labor contracts which were due to expire in June 1965. In 1963 NMU agreed with its contract employers that its agreement would be extended until June 1969, subject to possible "wage reopeners" in 1967 or 1968. NMU hoped that the other unions would follow, thus creating some degree of stability in maritime labor relations. However, this did not occur. When the non-NMU contracts expired in 1965, there was a strike by MEBA which shut down a large segment of the shipping industry. One of the problems was the contention that MEBA was not receiving benefits granted to MMP.

When the 1965 agreements with MEBA, MMP and ARA were arrived at, one of the features of these agreements was what are known as "most favored nation" clauses. These clauses provided basically that each union would receive the equivalent of the most favorable treatment given to another union. The 1965 agreements were to last until June 1969.

The NMU contract, having been entered into prior to 1965, did not have a most favored nation clause.

The most favored nation clauses proved to be highly unsatisfactory. An arbitration award in favor of one union would lead to an arbitration proceeding by another union claiming to be entitled to the benefits conferred upon the union in the first proceeding.

Moreover, during the 1965–1969 period serious questions arose regarding the funding of union pension plans. One problem related to what is called the "past service liability."

When the union pension funds were established (the NMU fund was established in 1951), the companies became liable for contributions, not only for benefits based upon current services of the employees, but also for benefits based upon past services—i. e., services performed by employees prior to the adoption of the pension plan. By the late 1960's the companies as a whole were delinquent on their past service liabilities to the extent of many millions of dollars.

Subsequent to the conclusion of the 1965 labor contracts, the ARA obtained an arbitration award directing that the past service liability of the companies to the ARA pension plan should be made up in a short period of time—about five to seven years. This was a cause of severe consternation to the shipping companies. If the formula decided upon by the arbitrator with respect to the ARA were to be applied with respect to other union pension funds, the burden on the companies would be acute.

Lee Pressman, attorney for the MEBA, proposed a compromise. Under his proposal the funding of past service liabilities would be stretched out to either 15 or 25 years depending on the relative age of the vessels owned by a particular company. A company having vessels with an average age of more than 20 years would fund its past service liability over a period of 15 years. A company having vessels with an average age of less than 20 years would fund the past service liability over a period of 25 years. It appears that in 1967 this proposal was agreed upon by the TSC and MSC and also by the group of unions—

NMU, MEBA, MMP and ARA. The evidence is not precise as to whether the independent shipping companies agreed. The implication is that they acquiesced in their normal manner.

Obviously the companies able to stretch their past service funding over 25 years would have a somewhat lighter financial load than the companies required to do the funding in 15 years. Commerce and Vantage contend that this was one of the instances in which the larger shipping companies combined to place the smaller companies at an economic disadvantage. The idea is that the larger companies had the newer fleets and dealt themselves the more favorable funding treatment.

The weight of the evidence does not support this contention. For instance, United Fruit had a large fleet, but the age of the fleet was such as to put United Fruit in the shorter—15 year—funding category. Commerce itself appears to have been eligible to receive the benefit of the 25-year funding.

During this period, NMU and MEBA manifested concern about loss of jobs for their members due to discontinued operation of vessels or sale of vessels to companies not having contracts with these particular unions.

On January 22, 1968 Joseph Curran, president of NMU, wrote Silver complaining:

"The shipowners have been engaged in the sale and transfer of vessels and the merger of companies at such a rapid rate that new transfer agreements go into effect before the ink on the old ones is dry."

The letter stated that this situation prevented "stability" in the industry and further stated that the union would take

". . . appropriate action to protect its contracts, the security of its pension programs, and the rights of our members and their families to receive the pension benefits which they have earned."

NMU took no immediate action. However, MEBA entered into discussions on the subject with Silver. The result was that in May 1968 MSC and MEBA agreed upon an amendment to their collective bargaining agreements in the form of a restraint on transfer clause of the kind which later became the Article I, Section 2 involved in this action. In other words the genesis of NMU's restraint on transfer clause was the MEBA–MSC contract amendment of May 1968.

In late 1968 and early 1969 the unions and the TSC and MSC were preparing for the collective bargaining negotiations which would take place in connection with the expiration of the NMU, MEBA, MMP and ARA contracts in June 1969.

The subject of funding the union pension plan was under further consideration. Funding of union pension plans was based upon contributions from the companies. An individual company would contribute on the basis of the number of man-days of employment with that company. If a company scrapped or sold vessels, or if it acquired more modern vessels requiring less crew, this company's man-days of employment would be reduced. The practice in the industry was to have periodic calculations by actuaries as to the amounts of money required to fund the union pension plans and the number of man-days being worked, and an assessment of the amount of money per man-day required to be contributed.

The unions were concerned about the solvency of their pension plans because of loss of employment—reduction in man-days—in the United States maritime industry. The problem related to the entire subject of funding, both past service and present service liabilities. The concern existed despite the fact that in theory, even if man-days were reduced, solvency of the funds could be insured by actuarial adjustments increasing the contribution per man-day.

During 1968 and early 1969 NMU, MEBA, MMP and ARA reached an agreement among themselves that they would present, as far as possible, com-

mon demands to the shipping companies in the forthcoming 1969 collective bargain negotiations. This was designed to avoid disputes which had been created by different unions obtaining different benefits. The common bargaining approach was also designed to do away with the most favored nation clauses, which were now condemned by both the companies and the unions.

One of the demands which the unions agreed to make upon the companies was for guaranteed minimum contributions to the union pension funds. It was also agreed that each of the unions would request the restraint on transfer clause which had been obtained by the MEBA from the MSC in May 1968.

The collective bargaining negotiations opened on April 2, 1969. It had been arranged that these negotiations would be held on a coordinated basis involving all of the unions—NMU, MEBA, MMP and ARA. At the opening session on April 2 representatives of all the unions met together with company representatives. Thereafter, at least for a time, company representatives met with a different union each day on a rotating basis.

Invitations to the negotiations commencing April 2 were given not only to the TSC and MSC companies but also to the independents, including Commerce. However, there was little or no participation by the independents. Commerce attended none of the sessions. The effect was that the negotiations on behalf of all the companies were carried on by the representatives of the TSC and MSC.

The first phase of the negotiations concerned what are called "economic terms"—referring in general to wages, overtime rates, pension fund contributions and similar items. The second phase of the negotiations related to work rules and other items not covered by the economic terms.

By July 1969 the economic terms had been worked out. These terms were in-corporated in memoranda of understanding relating to the different unions. Such a memorandum, relating to NMU and the tanker companies, was signed by NMU and the TSC on July 16, 1969. This memorandum was sent to Commerce for signature. Commerce signed and returned it to NMU on July 13, 1969.

Among other things, the NMU-tanker company economic terms provided that the tanker companies would guarantee pension fund payments to NMU under a formula which would provide a minimum of $44 million per year. It appears that this formula was intended to include both past service and present service obligations.[4]

With regard to the restraint on transfer clause, it was apparently assumed by all parties to the negotiations that the clause, which had been adopted by MEBA and the TSC in May 1968, would be incorporated in all the collective bargaining agreements being negotiated in 1969. There is no evidence of any debate or dispute on the subject. J. M. Calhoon, president of MEBA, wrote a letter to Silver dated June 25, 1969 "confirming" the purpose of the May 1968 memorandum of understanding as to the restraint on transfer clause as follows:

> "The original and continuing purpose of said Memorandum is: To preserve the jobs and job rights of the Company's engineers covered by our collective bargaining agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such engineers under said Agreement."

The restraint on transfer clause was not included in the July 16, 1969 memorandum of understanding regarding the NMU-tanker company economic terms. It appears that this clause was formally agreed upon at some point during the balance of the contract negotiations, which lasted until sometime in December 1969.

---

4. The guarantees turned out to be somewhat illusory. By 1972 the companies were behind in their contributions by several million dollars. NMU forgave the deficiency.

Subsequent to July 1969, Commerce was sent three other memoranda of understanding relating to various provisions—on August 5, August 18 and September 30. None of these dealt with the restraint on transfer clause.

However, the restraint on transfer clause (Article I, Section 2) was included in the final agreement—the so-called "Bluebook," entitled "June 16, 1969–June 15, 1972 Agreement Between Various Tanker Companies and The National Maritime Union of America, AFL–CIO." Due to an oversight by NMU personnel, the companies were not actually requested to sign the final agreement or any memorandum indicating their assent to it. However, the agreement was put into effect. Commerce made no objection to the restraint on transfer clause or to any other provision. Commerce does not deny that it was in fact a party to the final agreement, although Commerce never signed it.

It appears that the restraint on transfer clause was included in the other union contracts—*i.e.*, MEBA, MMP and ARA- · negotiated in 1969 with both the tanker and non-tanker companies.

I reject the contention of Commerce and Vantage that the TSC and MSC, as far as any issue in this case is concerned, negotiated improperly for the benefit of the larger companies vis-a-vis the smaller companies such as Commerce. The restraint and transfer clause was a demand by the unions on all the companies, large and small. There is no evidence whatever to suggest that the larger companies promoted the restraint on transfer clause in any way, or regarded it as a device to benefit them at the expense of the smaller companies. As to the matter of maintaining the pool of contributors to the union pension funds, it is clear that this was one of the reasons why the *unions* demanded the restraint on transfer clause from *all* the companies. However, there is no evidence that the larger companies sought the restraint on transfer clause in order to lock smaller companies into the group of pension fund contributors. There is also no

support in the evidence for the contention that the restraint clause was intended to encourage sales to foreign companies, thus reducing competition in United States flag trade.

## Sale of the S.S. Barbara

As of late 1970 Commerce was owned by Vernitron Corporation of Great Neck, New York. The president of Commerce was Milton Pilalas. Herman S. Nathanson became president of Vernitron in November 1970.

Vernitron decided to discontinue its shipping business and to sell Commerce's two vessels—S.S. Thalia and S.S. Barbara. Nathanson took charge of the arrangements for the sale of the vessels. Because of disagreements between Pilalas and Vernitron, Pilalas had little participation in the dealings relating to the sales of the Thalia and the Barbara.

Nathanson was assisted by David Cohen, house counsel and assistant secretary of Vernitron. Vernitron also retained admiralty counsel—Kenneth Simon.

Final negotiations for the sale of the vessels took place in late December 1970. The prospective purchaser of the Thalia at this time was Tanker "Four Lakes," Inc. For the Barbara, it was Vantage Steamship Corp. The president of Vantage was Philip Corletta.

Simon was familiar with the restraint on transfer clause in the union agreements. The contract for the sale of the Thalia to Tanker "Four Lakes" contained a paragraph complying with that clause—*i.e.*, requiring the continuation of the same unions. This clause apparently presented no problem to Tanker "Four Lakes."

Simon prepared a draft contract for the sale of the Barbara to Vantage. This draft contained a paragraph about continuation of unions.

On December 22, 1970 the representatives of Vernitron—Nathanson, Cohen and Simon—met with Corletta of Vantage. In the midst of discussing various matters, there was a brief mention of

the union continuation clause. Corletta said that the clause must be eliminated because Vantage was an SIU company. Nathanson or Simon asked about a possible union problem for Commerce. Corletta replied that after the vessel was delivered this would be Corletta's problem.

The contract for the sale of the S.S. Barbara by Commerce to Vantage was signed December 23, 1970. It did not contain a union continuation clause. The vessel was to be delivered on or before February 28, 1971, although the time could be extended for certain specified reasons, or for any reason beyond Commerce's control, to April 4, 1971. The contract would be extended even after that date if Vantage did not give notice of cancellation.

*Events Subsequent to Sale*

A public announcement of the sales of the Thalia and the Barbara by Commerce was made on December 28, 1970. Word of the sales was picked up by NMU shortly thereafter. There apparently was no problem from NMU's standpoint regarding the Thalia. However, NMU was concerned about the Barbara being transferred to an operator under contract with SIU. On January 7, 1971 Mel Barisic of NMU called Pilalas of Commerce to inquire about the sale. On January 11 Barisic sent a letter to Commerce asking what steps would be taken to comply with Article I, Section 2 of the Commerce-NMU contract. On January 13 Pilalas responded by letter stating that he had no reason to believe that the same unions would not be continued on the Barbara following the sale.

At about this time, an NMU lawyer spoke to Corletta of Vantage on the telephone, requesting an undertaking from Vantage that Article I, Section 2 would be complied with. Corletta refused to give such assurance.

On January 25, 1971 NMU made a demand for arbitration of its rights under Article I, Section 2 respecting the sale of the Barbara. This resulted in the arbitration held February 8 before Arbitrator Kheel and his decision in favor of NMU, all as described earlier in this opinion.

In the earlier portion of this opinion entitled "Prior Proceedings" I have described the main features of the complex litigation which occurred during 1971–1973. Certain other details must be added. These relate particularly to questions about (1) the frustration of the sale of the Barbara to Vantage and of a charter which Vantage had obtained for the Barbara; (2) the fixing of the injunction bond by Judge Frankel; and (3) the timeliness of the appellate remedies sought by Commerce and Vantage.

On the same day the arbitration occurred—February 8, 1971—Vantage entered into an agreement with Standard Oil of California ("SoCal") to charter the Barbara to SoCal for one year commencing some time between February 15 and March 5, 1971.

As stated earlier, NMU sued in this court on February 9, 1971 to obtain enforcement of Arbitrator Kheel's award of February 8.

At the time the complaint was filed, NMU presented an order to show cause for a hearing on a preliminary injunction motion to restrain the sale of the Barbara in violation of Article I, Section 2. Judge Wyatt signed the order to show cause setting the hearing on the preliminary injunction motion for February 16. The order to show cause also contained a temporary restraining order. Judge Wyatt fixed the amount of the bond for the TRO as $10,000.

On February 10 NMU and Commerce agreed to adjourn the hearing to February 23 and agreed that the TRO would remain in effect.

On February 11 NMU posted the required $10,000 bond. Under the terms of the bond the surety undertook

"  .  .  . that the Plaintiff [NMU] will pay to the Defendant [Commerce Tankers Corporation] so enjoined, such damages not exceeding the sum of Ten Thousand and No/100 ($10,000) as it may sustain by reason of the injunc-

tion, if the Court shall finally decide that the Plaintiff was not entitled thereto; such damages to be ascertained by a reference, or otherwise as the Court shall direct."

On February 18 Commerce filed papers supporting Vantage's motion to intervene which had been filed February 16. Commerce also opposed NMU's motion for a preliminary injunction and requested that the TRO be vacated, or in the alternative asked that NMU be required to post a bond in the amount of $2,750,000 to cover Commerce's potential loss of the ship sale and an additional bond to cover Vantage's potential loss of the SoCal charter.

Following a hearing on February 18, Judge Wyatt handed down a memorandum on February 19 granting Vantage's motion to intervene and holding that the temporary restraining order should be dissolved on condition that a bond be posted to cover contributions to the NMU pension fund. On February 22 Judge Wyatt signed an order based on that memorandum and fixing the amount of the bond as $278,361.

Commerce and Vantage agreed that each would provide half of this bond. Commerce arranged for its half. Vantage failed to provide its half.

The preliminary injunction motion was heard on February 23 by Judge Frankel. On that day he orally restored the TRO. On February 24 Judge Frankel signed an order continuing the TRO on the basis of a $10,000 bond posted by NMU. On February 25 Judge Frankel signed a revised TRO, again fixing the bond at $10,000.

Judge Frankel's decision of March 2, holding that a preliminary injunction should issue prohibiting the sale of the Barbara in violation of Article I, Section 2, further held that the $10,000 amount of the TRO bond would be sufficient for the · preliminary injunction. Judge Frankel stated that in his view the protestations of Commerce and Vantage regarding threatened financial loss were not impressive. Judge Frankel noted

that Commerce and Vantage had simply ignored the Article I, Section 2 provision, and had made their contract without seeking a timely test before a court or arbitrator.

Judge Frankel's preliminary injunction of March 4 contained the provision:

"ORDERED, that Plaintiff shall post a bond in the amount of Ten Thousand ($10,000.00) Dollars for the payment of such costs and damages as defendant may be found to have incurred should it hereafter be determined that this injunction was wrongfully issued."

Apparently none of the parties, in submitting proposed orders to Judge Frankel, considered the possible need to delineate the rights of Commerce and Vantage with respect to the bond or bonds. In any event, the caption of the order refers to Commerce as "Defendant" and Vantage as "Intervening Defendant." The paragraph in the order dealing with the bond refers only to a singular "defendant," which, literally read, would mean Commerce. In any event, no other bond was ever filed than the $10,000 bond filed in the TRO. The sole beneficiary of this bond is Commerce.

March 5, 1971 was the original deadline for delivery of the Barbara by Vantage to SoCal on the charter. This deadline was orally extended. During the subsequent period of time there were intensive discussions regarding possible mechanisms for carrying out the SoCal charter for the Barbara. Vantage finally agreed that Commerce could charter the Barbara to SoCal, with Vantage reserving its right to sue Commerce for non-delivery of the vessel, and for profits derived from the charter. However, SoCal refused to accept this proposal and on March 11 notified Vantage that it considered the charter canceled. SoCal's cancellation was the result of complications regarding the injunction and union problems. The evidence shows that at least through the end of March SoCal would have chartered the Barbara if these problems had been resolved.

On March 12, 1971 Commerce requested Vantage to free Commerce to sell the Barbara to another buyer. This request was without prejudice to any alleged damage claims of Vantage. It is clear that, following the cancellation of the SoCal charter, Vantage did not in fact wish to proceed with the purchase of the Barbara, at least at the contract price of $2,750,000. However, until May 26, 1971, Vantage continued to formally insist upon the delivery of the Barbara in order to preserve Vantage's legal rights.

On March 18 Commerce obtained an order to show cause, returnable March 23, for a resettlement of Judge Frankel's order of March 4. The proposed revision was a paragraph stating that Commerce was free to sell the Barbara to a purchaser other than Vantage, who could comply with Article I, Section 2. On March 24 Judge Frankel denied this application.

As described earlier, Commerce at this time was involved in arbitration proceedings against Vantage under the aegis of the state court. Also, commencing in late May there was an NLRB proceeding, resulting in an action in the federal court to obtain a preliminary injunction against NMU under 29 U.S.C. § 160(*l*), which was denied by Judge Croake on June 4, 1971.

However, Commerce and Vantage had a right of immediate appeal from Judge Frankel's injunction of March 4. The chronology which is now set forth shows that Commerce and Vantage chose not to prosecute this appeal on any urgent basis.

No notices of appeal were filed until Vantage did so on April 1 and Commerce on April 2. Commerce filed the record on appeal with the Second Circuit on May 12 and obtained an extension for filing its brief until June 20. On June 17 Commerce obtained another extension to July 20. On July 19 Commerce obtained a third extension to August 20, 1971.

On July 20 Commerce filed a motion in the Court of Appeals requesting that the preliminary injunction of Judge Frankel be suspended, modified or dissolved, or, in the alternative, that the bond required to be posted by NMU be increased to $2,750,000. On August 17 Commerce applied for an extension of another 60 days to file its brief. This proposed extension would have lasted until October 19, 1971.

On August 18 the Court of Appeals (Judges Feinberg, Mulligan and Timbers) denied the motion to vacate or amend the injunction and denied the request to increase the bond to $2,750,000. The court ordered that the appeal be expedited and that all briefs should be filed on or before September 29, 1971 with a hearing the week of October 4, 1971. This schedule was complied with.

As already described, the Court of Appeals considered together Judge Frankel's granting of the preliminary injunction in favor of NMU and Judge Croake's denial of a preliminary injunction against NMU in the NLRB action. The Court of Appeals reversed both rulings on March 22, 1972, by which time the proposed sale of the Barbara to Vantage and the charter of the Barbara to SoCal were no longer feasible.

Neither Commerce nor Vantage made any attempt to obtain immediate or accelerated action by the Court of Appeals—either by motion for a stay, motion for an increased bond or swift prosecution of their appeal. Commerce's motion to suspend Judge Frankel's injunction or to increase the amount of the bond was not filed until 4½ months after the entry of the injunction. Due to Commerce's repeated requests for extensions of time for filing its brief, the appeal was not heard until seven months after the date of the injunction, and the hearing would have been delayed further had it not been for the deadline imposed by the Court of Appeals.

There is every reason to believe that, had Commerce and Vantage proceeded immediately in the Court of Appeals, they could have obtained expedited review. The viability of the transactions

involving the sale and charter of the Barbara was clearly threatened by any appreciable delay. It is difficult to believe that the Court of Appeals would have ignored this. Exactly what response the court would have made to a request for immediate appellate action cannot, of course, be known. But Commerce and Vantage never attempted to obtain such relief.

■ It should be noted that in August 1971 Commerce had discussions through a broker regarding a possible sale of the Barbara to a company called Northeast Petroleum Company, for foreign flag operation. Northeast at first offered $1.3 million and then reduced its offer to $1 million. Northeast asked Commerce to obtain a letter from NMU stating that NMU would not strike Northeast's United States facilities if Northeast bought the ship for foreign flag operation. Counsel for NMU supplied a letter which made no express concessions, but stated "the collective bargaining agreement is self-explanatory." The sale to Northeast Petroleum did not go through. To the extent that Commerce claims that NMU is responsible, I reject this argument. Certainly there is nothing in Article I, Section 2 which in any way prevented the sale of the Barbara to Northeast Petroleum.

## Conclusions of Law

### The Labor Statutes

At an earlier point in this opinion I summarized the arguments of Commerce and Vantage in support of their claims for damages under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, and Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). I reject each of these arguments and hold that neither Commerce nor Vantage has a valid claim under these provisions.

The argument that NMU coerced Commerce into entering into the collective bargaining agreement containing the restraint on transfer clause is contrary to the facts. Commerce was con-

tent to have the TSC representatives, who had the maximum bargaining power, negotiate on its behalf. Commerce declined the invitation to participate in the negotiations, and took no exception to the terms agreed to by its de facto representatives. The practical necessities of this type of bargaining do not constitute the type of coercion requisite for a violation of Section 8(b)(4).

I also reject the argument that the strike threat contained in Article I, Section 2 exerted coercion and force on Commerce and Vantage, causing the frustration of the sale of the Barbara to Vantage and the charter of the Barbara to SoCal. These arguments have no factual support. The strike provision in Article I, Section 2 did not prevent Commerce from making the agreement for the sale of the Barbara to Vantage. When it came to enforcing Article I, Section 2, NMU did not strike or threaten to strike. NMU went to arbitration and then to court. As to the SoCal charter, this was frustrated as a result of the preliminary injunction and the impatience of SoCal with the legal complications with NMU. SoCal did not cancel because of any coercion from a strike threat.

The final argument under Section 8(b)(4) advanced by Commerce and Vantage is that NMU restrained Commerce and forced Commerce to cease doing business with Vantage, by obtaining the preliminary injunction from Judge Frankel.

■ The Fifth Circuit Court of Appeals has analyzed the statute and legislative history, and has held that resort to a court for a judicial remedy is not coercion within the meaning of Section 8(b)(4). *Local Union No. 48 v. Hardy Corp.*, 332 F.2d 682 (5th Cir. 1964). The court stated (p. 686):

"We believe that the Congress used 'coerce' in the section under consideration as a word of art, and that it means no more than nonjudicial acts of a compelling or restraining nature, applied by way of concerted self help

consisting of a strike, picketing or other economic retaliation or pressure in a background of a labor dispute. Our view is supported by the legislative history."

On the basis of this well-reasoned authority, I reject the contention that NMU violated Section 8(b)(4) by seeking and obtaining a preliminary injunction.

## Sherman Act

I have already found against the factual contentions of Commerce and Vantage regarding an alleged combination or conspiracy by the larger shipping companies to enhance their financial and competitive position. However, this leaves open the question as to whether the restraint on transfer clause in the collective bargaining agreement amounted to a *per se* violation of Sherman Act § 1. This, in turn, raises another question as to whether the restraint on transfer clause is exempt from the federal antitrust laws.

Both of these issues involve difficult and complex questions of law. The exemption problem depends upon the application of the recent Supreme Court decision in *Connell Construction Co. v. Plumbers and Steamfitters Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), and earlier decisions, particularly *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Meat Cutters Local 189 v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). The *per se* violation question also presents numerous problems.

█ It is inappropriate and unnecessary for me to decide these questions. Even if Article I, Section 2 were held to violate Sherman Act § 1, under the facts of this case I would necessarily hold that such violation was not the proximate cause of the injuries sustained by Commerce and Vantage.

NMU took no action to implement or enforce Article I, Section 2 other than to seek a determination of its legal rights by arbitration and by resort to this court. Prior to NMU's commencement of litigation, Article I, Section 2 had not deterred Commerce or Vantage in any way. The provision had simply been ignored.

The proximate cause of the delay and final frustration of the S.S. Barbara transactions was the preliminary injunction issued by Judge Frankel in a case admittedly involving close and difficult questions of law. The problem created by the injunction was compounded by the long delay of Commerce and Vantage in seeking an appellate remedy.

There can be no recovery in this case on any theory of antitrust violation. Commerce and Vantage can recover only to the extent permitted by the specific rules relating to injuries suffered as a result of the granting of an injunction.

## Remedy Regarding Injunction

Rule 65(c) of the Federal Rules of Civil Procedure provides:

"(c) *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof."

█ There has been some divergence of view as to the rights, if any, of a party to recover damages for injury resulting from a preliminary injunction later determined to have been erroneously issued. The resolution of the problem by the majority of the courts, both before and after the adoption of Rule 65(c) is as follows. In the absence of malicious prosecution, the seeking of injunctive relief is not a tort. However, a party obtaining a preliminary injunction may be required, as a condition of obtaining the injunction, to provide a bond or other undertaking to indemnify the defendant for injuries resulting from the injunction, if the injunction is later overturned.

In such a case recovery by the injured party is limited to the amount of the bond or undertaking. *Associated General Contractors v. Illinois Conference of Teamsters*, 486 F.2d 972, 975 n. 6 (7th Cir. 1973); *United Motors Service, Inc. v. Tropic-Aire, Inc.*, 57 F.2d 479, 483 (8th Cir. 1932); 7 *J. Moore, Federal Practice* ¶ 65.10[1], at 65–98 (2d ed. 1975); Note, *Recovery of Damages on Injunction Bonds*, 32 Colum.L.Rev. 869, 871 (1932). The Court of Appeals for the Second Circuit summarized the rule as follows (Judge Learned Hand, joined by Judges Augustus Hand and Chase):

> "Any one who acts honestly and does not subject himself to a charge of malicious prosecution is as free from liability in invoking the action of a court as the court itself, and what he does under its order is not a wrong. The party aggrieved has no remedy except in so far as the court may have protected him by bond or otherwise, as a condition upon the order, and as security against its own errors." *In Re Spencer Kellogg & Sons*, 52 F.2d 129, 135 (2d Cir. 1931).

Under this rule, the maximum liability of NMU with respect to the preliminary injunction is the amount of the $10,000 bond. As already described, this bond runs solely in favor of Commerce.

I have not made detailed findings with respect to the damages of Commerce resulting from the injunction. However, it is clear that such damages are in excess of $10,000. I hold that Commerce is entitled to judgment against NMU for $10,000 in 71 Civ. 582.

■ Since there is no bond in favor of Vantage, I hold that the complaint of Vantage in 72 Civ. 4619 must be dismissed. *Benz v. Compania Naviera Hidalgo, S.A.*, 205 F.2d 944, 948 (9th Cir.), *cert. denied*, 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389 (1953).

■ Commerce and Vantage assert that the preliminary injunction was entered under Section 7 of the Norris-La-Guardia Act, 29 U.S.C. § 107, and that damages in excess of the bond are recoverable under this statute, citing the Third Circuit decision in *United States Steel Corp. v. United Mine Workers*, 456 F.2d 483 (3d Cir.), *cert. denied*, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972). No extensive discussion of this point is necessary. In the proceedings before Judge Frankel, there appears to have been no reference to Section 7 of the Norris-LaGuardia Act. Both Commerce and Vantage, in their papers filed at the time, treated the application for preliminary injunction as being under Fed.R. Civ.P. 65. In any event, the weight of authority is contrary to the Third Circuit view, and holds that Norris-LaGuardia Act § 7 does not depart from the common law rule limiting recovery to the amount of the injunction bond. *Associated General Contractors v. Illinois Conference of Teamsters*, 486 F.2d 972, 975 (7th Cir. 1973); *Int'l Ladies' Garment Workers' Union v. Donnelly Garment Co.*, 147 F.2d 246, 252–53 (8th Cir.), *cert. denied*, 325 U.S. 852, 65 S.Ct. 1088, 89 L.Ed. 1972 (1945). *See also Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560 (2d Cir. 1974); *Detroit Newspaper Pub. Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).

### Miscellaneous Claims

The foregoing discussion is sufficient to dispose of the claim of Commerce and Vantage that NMU induced the breach of the contract for the sale of the Barbara. In other words, the answer to this claim is that the proximate cause of the asserted injuries was the preliminary injunction, and the remedy of Commerce and Vantage is limited to the injunction bond.

■ Vantage's contention that it is entitled to damages because NMU violated New York's Donnelly Anti-Trust Act can be disposed of on the basis of the clear holding in *Connell Construction Co. v. Plumbers and Steamfitters Union No. 100*, 421 U.S. 616, 635–37, 95 S.Ct. 1830, 1841–42, 44 L.Ed.2d 418, 433–34

(1975), that, even if there is no exemption from *federal* antitrust laws, there could be no application of state antitrust laws in a setting such as the present case.

With respect to NMU's contention that all claims of Commerce and Vantage are barred by the 1973 settlement between these parties, I reject this defense. The releases exchanged between the parties expressly reserved the rights of Commerce and Vantage against NMU.

### Conclusion

The counterclaims of Commerce against NMU in 71 Civ. 582 are dismissed, except that Commerce is entitled to judgment against NMU on the second counterclaim in the amount of $10,000.

The complaint of Vantage in 72 Civ. 4619 is dismissed.

No costs are awarded as against any party.

NMU is directed to submit appropriate judgments.

So ordered.