**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, Plaintiff,**

v.

**COMMERCE TANKERS CORPORATION, Defendant.**

**No. 71 Civ. 582.**

United States District Court,
S. D. New York.

March 2, 1971.

Abraham E. Freedman, New York City, for plaintiff; Charles Sovel, Ned R. Phillips, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant; Charles H. Miller, New York City, of counsel.

Hill, Betts & Nash, and Surrey, Karasik, Greene & Seham, New York City, for intervenor; Martin C. Seham, Fred C. Klein, Eli Ellis, John F. Lang, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Under its collective agreement with the plaintiff, National Maritime Union of America (NMU), covering the three years ending June 15, 1972, the defendant, Commerce Tankers Corporation, promised not to transfer either of its two ships unless the purchaser agreed to assume the obligations of the union contract. Nevertheless, without informing the Union, defendant, in December 1970, contracted to sell its ship SS Barbara, but exacted no promise from its purchaser to honor the NMU agreement. Upon learning of the proposed transfer, the NMU moved promptly to demand arbitration under the collective agreement. Defendant sought and obtained delays it may now come to regret; its request for still further delay was rejected by the Union. The experienced permanent arbitrator designated by the parties in their agreement held that the proposed transfer of the ship was forbidden, and he enjoined it. Now, resisting enforcement of the award, the defendant tenders a variety of trivial objections along with a relatively substantial argument that its collectively bargained obligation is void and unenforceable because it violates the antitrust laws. The proposed transferee of the vessel, Vantage Steamship Corp., has been permitted to intervene, and it likewise argues that the disputed contract provision and the arbitral award thereunder must be nullified. The court, acceding to requests that it move speedily—requests pressed with special urgency by the defendant and the intervenor because of their imminent contract deadlines—has come to the conclusion that defendant's obligation is valid, subsisting and properly enforced by the award of the arbitrator. Accordingly, the Union's application for a preliminary injunction, which may well amount in practical effect to a final decision, will be granted.

The contract provision upon which the NMU relies, Article I, Section 2, reads this way:

"(a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be agreed upon between the Union and the transferee. The term 'transfer' shall be construed to include any chartering of a vessel by the Company.

"(b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as hereinabove provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments there-

to to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.

"(c) The Company agrees that if it desires to sell, bareboat charter or in any manner whatsoever transfer a vessel to another business entity, whether for United States flag or Foreign-flag registry, timely written notice to the Union must first be given prior to any such sale or transfer.

"(d) This Section shall be deemed of the essence of the Collective Bargaining Agreement and in the event of any violation, the no-strike provision of this Agreement shall not be applicable."

Having no doubt about the meaning of this provision, defendant decided last October to sell its two vessels. It sold one in December and contracted later in the same month for sale to the intervenor of its remaining ship, the Barbara. Defendant said nothing to the NMU about this. It made no effort to seek relief either in the form of some concession by the Union or in a declaratory or other judicial proceeding when there was time to press at relative leisure the claim that the plain obligations of defendant to honor and preserve its NMU contract were somehow void and unenforceable. Instead, defendant proceeded in secret, and, on December 23, 1970, executed its contract for sale of the vessel and delivery on February 28, 1971, to the intervenor.[1] That contract contained no provision of the kind defendant was obliged to obtain requiring compliance by the purchaser with the subsisting collective bargaining agreement.

On or about January 11, 1971, the NMU learned that there might be a sale of the Barbara. It wrote promptly to defendant, reported its information that defendant was "contemplating" such a sale, reminded defendant of the requirement for preservation of the collective agreement, and requested appropriate information and assurance.

In a response on January 13, seemingly inaccurate if not intentionally misleading, defendant acknowledged that it had made a contract for sale of the Barbara; acknowledged, too, its contractual duty to preserve the collective agreement; and supplied the following double-talk on this key point:

"Commerce Tankers Corporation is a wholly-owned subsidiary of Vernitron Corporation, and the final negotiations for the sale of these vessels were made directly between Vernitron Corporation and the buyers through the brokerage firm of Blix-Mallory & Company. For your guidance, at the start of negotiations for the sale of these vessels I advised Mr. Blix of Blix-Mallory & Company that the same unions, including NMU, with which Commerce Tankers Corporation had collective bargaining agreements must continue to man the vessels after their sale, and that this was to be made a condition of the sale; and he assured me that this was fully understood and would be impressed on prospective buyers. I know that the same unions are continuing on the THALIA and have no reason to believe that it will be otherwise with the BARBARA."

Actually, of course, defendant knew, or carefully insulated itself from learning, that it would "be otherwise with the BARBARA."

The Union wasted no time asking defendant's purchaser and learning that its contractual rights would not be assumed or recognized after the sale. On January 25, 1971, the NMU demanded arbitration of its resulting dispute with defendant. Defendant requested and was

---

1. It bears emphasis that under the collective agreement defendant had promised that "if it desire[d] to sell, bareboat charter or in any manner whatsoever transfer a vessel to another business entity, * * * timely written notice to the Union must first be given prior to any such sale or transfer."

granted a postponement to February 8. A request for a further adjournment was refused.

On February 8, 1971, following the plain terms of the contract between the NMU and defendant, the arbitrator held illegal and enjoined the proposed sale unless the purchaser acknowledged the contract rights of the NMU. A day later, the NMU brought this suit to enforce the award. Judge Wyatt granted a temporary restraining order on February 9. Then, on further consideration triggered by the intervenor, Judge Wyatt, on February 19, concluded that the restraint should be dissolved, and he entered an order to that effect on February 22, the day before argument of the instant motion, conditioned upon posting of a bond in the amount of $278,361.[2] Judge Wyatt also granted the motion of Vantage to intervene, allowing this company until March 1, 1971, for the filing of its answer. In dissolving his initial temporary restraining order Judge Wyatt indicated as his grounds, first, a belief that there was a "serious question" under the antitrust laws, and, second, "[o]n balance, * * * that Commerce and Vantage [would] suffer from the restraining order much more than NMU [would] suffer if it [was] dissolved." At the same time, of course, Judge Wyatt noted the pendency of the instant motion, and observed that his views on the temporary restraining order would leave open for independent consideration the matters now being decided.

## II.

■ Defendant's (and intervenor's) main point, and the only one of substance, is that the provision for preserving the three-year collective bargaining agreement against nullification by sale of the vessel must be treated as void because it violates the antitrust laws. The court has studied (again) the authorities thought to sustain this view. The demand for speed overcomes the wish to write in scholarly detail. It must suffice to outline briefly the court's reasons for rejecting the argument.[3]

The aim of a union to preserve jobs for its members and to prevent decimation of its ranks by transfer or sale of employer operations is among the most familiar forms of "action * * * in the union's self-interest in an area which is a proper subject of union concern * * *." Intercontinental Container Tr. Corp. v. New York Ship. Ass'n, 426 F.2d 884, 887 (2d Cir. 1970). The legitimacy of this concern is clear even in the absence of a contractual arrangement implementing it. "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." John Wiley & Sons v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). As the cited case shows, this familiar aspect of "national labor policy" has had the consequence of binding even "an unconsenting successor" (*Id.* at 550, 84 S.Ct. 909) to important obligations accepted by the predecessor employer. It is entirely in keeping with that same policy to recognize the right of a union to seek (and obtain if it can) an agreement that its contractual rights and status will not be terminated before the agreed expiration date through the unilateral decision of the employer to sell his plant or a substantial portion of it or, as here (what

---

2. After full argument on February 23, and apprised that transfer of the vessel was scheduled to be accomplished by February 28 (Sunday), this court revived the temporary restraint by orders of February 24 and 25.

3. The arbitrator here, as has been done in other cases, refrained from ruling on the antitrust issue, leaving it for the judicial determination now being made. Defendant says the very existence of such an issue rendered the arbitrator powerless to proceed at all. The argument rests upon a misreading of precedent too plain to require more discussion.

amounts to the same thing), his single remaining ship. That is all we have here, despite strings of citations to wholly different problems of antitrust conspiracy.

Accordingly, the short answer to defendant's main point is that the disputed contract provision "falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." Local Union No. 189, etc., Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 690, 85 S.Ct. 1596, 1602, 14 L.Ed.2d 640 (1965). See also United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Intercontinental Container Tr. Corp. v. New York Ship. Ass'n, 426 F.2d 884 (2d Cir. 1970); National Dairy Prod. Corp. v. Milk Drivers & Dairy Emp., 308 F.Supp. 982 (S.D. N.Y.1970).[4]

### III.

■ In further opposition to the Union's claim, it is contended, most strenuously by the intervenor, that the restriction in the collective agreement violates the so-called "hot cargo" provision in § 8(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(e).[5] By way of threshold refutation, the Union makes the cogent point that this is a topic for the exclusive competence of the N.L.R.B. rather than the court. See, e. g., San Diego Building Trades Council

v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The defendant, along with others in the shipping industry, has had 20 months or so in which to seek the Labor Board's authoritative judgment as to whether the disputed provision of the June 1969 agreement is unlawful. Having foregone that leisurely and appropriate course, the companies here seek what would amount to a ruling in their favor (and the most decisive kind of relief) in a tribunal which was not given initial or reviewing authority on the subject.

In any event, the court draws assurance for rejection of this point from its own appraisal of § 8(e). Granting this to be less authoritative than the view the Labor Board may ultimately take,[6] the court concludes that the contract restriction in question is outside the statute, in which, as the Supreme Court recently affirmed, "Congress * * * had no thought of prohibiting agreements directed to work preservation." National Woodwork Manufacturers v. N.L.R.B., 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967).

Other arguments from the law administered by the N.L.R.B. are less intelligible and less seemingly weighty. The intervenor reviews at length Labor Board learning about the desirability of "fleet-wide bargaining units" into which vessels constituting "accretions" are to be

4. Defendant argues that the illegality in the questioned restriction is somehow indicated because it applies only to ship sales to American, not foreign, buyers. This is a curious argument in a way; a limited restraint would seem normally less objectionable on account of the limitation rather than more. The point is not of great interest, however. The NMU has shown extensively the practical problems explaining the limitation. The Union, obviously, would have preferred a broader provision had it been workable. The limits of what was agreed upon are of no help now to defendant's effort to avoid the obligation altogether.

5. "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby

such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void * * *."

6. The intervenor has brought a Labor Board proceeding against both defendant and the NMU. Of course, if the court were to deny the relief the NMU seeks pending the Board's proceeding, the result would be an effective and only partially curable defeat for the Union. For in the absence of the relief being granted today, the ship and the jobs for NMU members would be transferred away.

incorporated. Special reliance is placed upon Moore-McCormack Lines, Inc., 139 N.L.R.B. 796 (1962). But in that very decision the Board made clear that the existence of "two bargaining units among [a single] Employer's unlicensed seamen [need not be considered] an insuperable obstacle to effective collective bargaining." *Id.* at 799. As to the effects of transfers upon an incumbent union, wholly apart from the kind of agreement for that contingency made by the parties herein, the Board merely cautioned that its decision was "not to be construed as indicating that in the future the transfer of a ship from one owner to another will necessarily preserve the existing bargaining unit or the status of the incumbent Union." *Id.*

It is not easy to understand how the intervenor finds help in that decision. The Board said (in the absence of any contract agreeing to such a result) that it might well (as it did in that very case), but not "necessarily," preserve the incumbent union's status upon transfer of a vesssel. *That does not remotely suggest that a contract assuring such preservation could be thought illegal.*

Finally, to give the subject more than it deserves, the intervenor seems mistaken in its apparent premise that rules defining appropriate bargaining units may or should be read to outlaw work-preserving agreements.

## IV.

There are some quibbles about the arbitrator's procedure and about the substance of his decisions. The attack upon his construction of the contract is frivolous; the question is patently outside the scope of judicial consideration. The claim that the arbitrator acted too speedily is not more imposing. Defendant kept the Union in the dark concerning its sale plans until the eleventh hour. Then it strove, with some success, to delay the arbitration. There was compelling reason for a swift decision. And the question of contract interpretation was a fairly simple one.

To show otherwise, defendant and the intervenor say that a strike was the only remedy for the breach asserted by the NMU, and that the arbitrator therefore exceeded his powers in granting an award in the nature of an injunction. In other words, defendant, selling its last ship without obtaining the assurance of continued incumbency it owed the NMU, concedes to the Union and the men the exclusive right to refrain concertedly from working at jobs they would no longer have. Arguments this frivolous are liable to lead courts erroneously to overlook better ones.

In any event, the arbitrator's authority to choose an appropriate remedy, like his power to construe the contract and govern his own procedures, was exercised well within the bounds in which his judgments are final and unreviewable. Cf. John Wiley & Sons v. Livingston, *supra*, 376 U.S. at 552–559, 84 S.Ct. 909; United Steelworkers v. American Mfg. Co., 363 U.S. 564, 567–569, 85 S.Ct. 1585 (1960).

## V.

The court concludes in sum that this is in overwhelming probability a case for confirmation of the arbitrator's award. The genuine issues appear to be only issues of law. The grounds for opposing the award are, with one exception, unsubstantial. As to that exception, the court is prepared on the materials before it to rule for the Union.

There are reasons of at least a technical nature, however, for postponing a formally final decision on the motion to confirm. Another judge of the court has granted a motion for intervention and authorized the filing of an answer by the intervenor. That answer had not been filed when the present motion was argued, and is not before the court as this is written.

In addition, defendant says it needs discovery on its antitrust contentions. This is put in the vaguest terms, and it is deeply unpersuasive. Nevertheless, the thought has not received full consid-

eration, and there is no need today to rule finally upon the propriety of proposed discovery proceedings.

Mindful of such loose ends, the court, with the acquiescence of the parties, has treated the instant proceeding as an application for an injunction *pendente lite* restraining transfer of the Barbara until final resolution of the proceeding to confirm the arbitral award. And the decision herein will be to grant such "temporary" relief. Judging from everything the parties say, the practical effect may well be final; the contract for sale of the vessel and the intervenor's obligation to deliver it to a charterer are due for execution hours from now (or may be, in some respects at least, possibly overdue already). Nevertheless, we are calling the relief sought and granted "preliminary" for at least the reasons already sketched.

Concentrating upon this—and upon the fact that the award to be enforced is itself injunctive in nature—defendant and the intervenor have devoted much argument to "weighing the equities," calculating in large numbers their monetary loss if they are barred from executing the sale transaction arranged in the teeth of defendant's agreement with the NMU. Against this, they attempt to show that the Union's loss is modest and easily compensable if they are allowed now to go ahead with their deal. The analysis, upon full reconsideration, is not impressive. Apart from the fact that injunctive relief, as the seasoned arbitrator determined, is the only kind truly effective and what defendant must be deemed to have bargained for, the equities favor the NMU and disfavor the companies by a heavy preponderance. If the defendant may simply shuck off the vessel and the collective agreement, the position of the Union (and its members) can never be restored or be accurately compensated for in money terms. The companies have deemed that hurt fully curable by their offer of a bond to make up lost pension and welfare contributions should the Union ultimately win. That treats the union as some sort of business devoted to the filling of its treasury and its "funds." Whether or not unions always cleave to their ideals, this is scarcely their nature or the measure of their legal rights. Omitted from the reckoning is the heart of the matter—the interest in "the preservation of work" for its members, Intercontinental Container Tr. Corp. v. New York Ship. Ass'n, *supra*, 426 F.2d at 887, as well as union power —which the companies here do not even try to reckon in dollar terms.

On the other side of the coin, we have only the regrettable but unappealing sorrow of self-inflicted wounds. As its briefs here show, defendant decided last October to sell its ships. It contracted for the instant sale in December. It deliberately neglected to tell the Union what was happening. It refrained from seeking either a dispensation or a test of a union refusal to waive the contract restriction. Even when the NMU made clear its position, defendant stalled and delayed an arbitral decision. The result has been a state of crisis, allegedly impending disaster and, perhaps less importantly, a demand for undeliberate and inconvenient speed in these court proceeding. The further result has come to be a preliminary injunction which may not be subject to the always desirable benefit of appellate review whereas a *nisi prius* decision timely sought might well have had such scrutiny.

This kind of avoidable emergency cannot weigh ponderously in a court of equity.

The equities of the intervenor can rise no higher. It knew or should have known what it was doing and what it was risking. It is, moreover, a stranger to the NMU. The Union's rights are not to be denied or postponed or diminished because such a party has in such a way stationed itself in the path of their enforcement.

Upon similar reasoning, the court, when it issued a temporary restraining order on February 25, 1971, required a bond in the amount of only $10,000. The

requirement will remain the same under the order now to be issued.

For the reasons stated, defendant, its officers, agents, attorneys and employees should be, and they are, enjoined and restrained pending the final decision in this case from selling or transferring the SS Barbara to any person or company unless there has been compliance with Article I, Section 2, of the collective bargaining agreement; provided, that the plaintiff shall post a bond in the sum of $10,000 for the payment of such costs and damages as defendant may be found to have incurred should this injunction be determined hereafter to have been issued wrongfully.

It is so ordered.[7]

7. There has been no focus by the parties upon the proper terms of an injunctive order if one was to be issued. While the problem does not seem complex, it is one upon which the court would welcome adversary views. At the same time, the court has sought to expedite the matter so that if there is any practical opportunity for appellate review, that should not be lost. Accordingly, if either side is troubled by the terms of the brief order embodied herein, the court invites submissions on short notice seeking changes deemed appropriate or necessary.