COMMERCE TANKERS
CORPORATION,
Defendant-Counterclaimant-Appellant,

and

Vantage Steamship Corporation, Intervening Defendant-Appellant,

v.

NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO,
Plaintiff-Appellee.

VANTAGE STEAMSHIP
CORPORATION,
Plaintiff-Appellant,

v.

NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO,
Defendant-Appellee.

Nos. 179, 180, Dockets 76–7217, 7223.

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1977.

Decided April 15, 1977.

794

D. David Cohen, Great Neck, N. Y., for defendant-counterclaimant-appellant.

Martin C. Seham, New York City (Surrey, Karasik, Morse & Seham, Fred C. Klein, Donald F. Devine, New York City, on the brief), for intervening defendant-appellant Vantage Steamship Corp.

Charles Sovel, New York City (Phillips & Cappiello), New York City, for plaintiff-appellee.

Before LUMBARD and FEINBERG, Circuit Judges, and COFFRIN, District Judge.*

FEINBERG, Circuit Judge:

Over six years ago, appellant Commerce Tankers Corporation for pressing economic reasons attempted to sell its last remaining vessel to Vantage Steamship Corp., also appellant here. Appellee National Maritime Union (NMU), which represented the seamen on the vessel, objected to the sale because Commerce had not obtained a commitment from Vantage to continue the NMU as bargaining representative, in accordance with a provision of NMU's collective bargaining agreement with Commerce. This began a flurry of litigation over a

---

* Of the United States District Court for the District of Vermont, sitting by designation.

period of several years among Commerce, Vantage, NMU and the National Labor Relations Board (NLRB), in combinations and permutations set forth below.

At first NMU blocked the sale, obtaining an arbitration award and an injunction in the United States District Court for the Southern District of New York. *National Maritime Union v. Commerce Tankers Corp.*, 325 F.Supp. 360 (S.D.N.Y.1971). That injunction, however, was reversed after the Regional Director of the NLRB, on an application under § 10(*l*) of the National Labor Relations Act, alleged that there was "reasonable cause to believe" that the clause invoked by the NMU violated section 8(e) of the National Labor Relations Act, see *McLeod v. National Maritime Union*, 457 F.2d 1127 (2d Cir. 1972), a preliminary determination later confirmed by the Board and by this court in *NLRB v. National Maritime Union*, 486 F.2d 907 (2d Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). Commerce and Vantage claimed that they suffered damages of $1,550,000 and $2,230,000, respectively, due to NMU's conduct, which they alleged violated not only the National Labor Relations Act, but also the Sherman Act.[1] After a non-jury trial in the United States District Court for the Southern District of New York, Judge Thomas P. Griesa found that the proximate cause of any damage was the district court injunction against the sale.

The judge therefore limited Commerce's recovery to the $10,000 injunction bond posted by NMU in the litigation below and denied Vantage any relief whatever, since it was not covered by the bond. 411 F.Supp. at 1225. This appeal followed. For reasons set forth below, we reverse and remand for further consideration of appellants' claim under the Sherman Act.

I

The background of this litigation is set forth in our two prior opinions cited above, and we will try not to repeat here anything but the essential facts. The contract clause in question, which is reproduced in the margin,[2] was contained in a multiemployer NMU collective bargaining agreement, to which Commerce was a party. The clause provided in substance that if Commerce sells a ship to an American flag shipper not already under contract with the NMU, the ship will be sold with a crew provided by the NMU, and Commerce will obtain from the purchaser "a written undertaking" to abide by the NMU contract. In the fall of 1970, Commerce's parent, Vernitron Corporation, decided for business reasons to go out of the shipping business. On December 23, 1970, Commerce contracted to sell the S.S. Barbara, an ocean-going tanker, to Vantage for a price of $2,750,000, with delivery scheduled for February 28, 1971. The contract did not contain any provision

1. Appellants also alleged, inter alia, violation of the New York antitrust law, wrongful injunction, and tortious interference with contract. Only the second of these claims is pressed here.

2. Article I, section 2, which is entitled "Sale and Transfer of Vessels," provides:
 (a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be

agreed upon between the Union and the transferee. The term "transfer" shall be construed to include any chartering of a vessel by the Company.
 (b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as hereinabove provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments thereto to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.

regarding "the complement of employees" to be furnished by the NMU; nor did Commerce obtain from Vantage the undertaking with the NMU called for by paragraph (b) of the restraint-on-transfer clause. See note 2, supra. At the time, Vantage could not properly have given such an undertaking, since it was party to a conflicting agreement with the Seafarers International Union of North America (SIU), a rival maritime union. In January 1971, Vantage chartered the ship it had contracted to purchase to the Standard Oil Company of·California (SoCal) for a period of one year, commencing on March 5, 1971.

At this point, furious activity ensued. The NMU demanded of Commerce and Vantage that Vantage accept the NMU as the bargaining agent of the unlicensed seamen employed aboard the ship. The SIU threatened to strike all Vantage vessels if it ceased using the SIU hiring hall to obtain its unlicensed seamen. Vantage threatened to sue Commerce if it did not deliver the S.S. Barbara in accordance with its contract. The NMU commenced and won a labor arbitration, at which the arbitrator did not consider the legality of the restraint-on-transfer clause; the award enjoined the sale of the vessel without compliance with the clause. The next day, the NMU began an action against Commerce in the United States District Court for the Southern District of New York for confirmation of the award. A week later, Vantage intervened as a party defendant and also filed unfair labor practice charges with the NLRB against the NMU and Commerce. After some other skirmishing, Judge Frankel in early March 1971 granted a preliminary injunction against the sale unless the contested clause were observed. The arguments of Commerce and Vantage

that the clause was illegal were given short shrift, *National Maritime Union v. Commerce Tankers Corporation,* supra, 325 F.Supp. at 364–65, and the court required NMU to post only a $10,000 bond. Both Commerce and Vantage appealed.

At about this time, Vantage's charter with SoCal was cancelled due to "union problems." Shortly thereafter, Commerce advised the NMU that all efforts to obtain a United States flag purchaser had been unsuccessful and Commerce asked the NMU to drop its objection to the transfer, offering to drop its legal attack on the clause. The NMU refused, saying that it "would not gamble that the ship might go SIU."

In late May 1971, the Regional Director of the NLRB issued a complaint against the NMU and sought a § 10(*l*) injunction against enforcement of the restraint-on-transfer clause. The NLRB's motion was heard along with a motion by Commerce to vacate the earlier preliminary injunction against it, in view of the intervening NLRB complaint. In July 1971, Judge Croake denied both motions, but it appears that were it not for the jurisdictional problem posed by the earlier appeal of Commerce and Vantage, the judge would have vacated the injunction obtained by the NMU.[3] The NLRB appealed from the order refusing a § 10(*l*) injunction.

By notice of motion dated July 21, 1971, Commerce moved in this court to vacate the NMU injunction against the sale of the vessel, or, in the alternative, to increase the bond to be posted by the NMU to $2,750,-000. Commerce advised the panel then sitting of the NLRB complaint and of various additional financial exigencies[4] and argued strenuously that at least the NMU "should

3. *McLeod v. National Maritime Union,* 329 F.Supp. 151, 160 (S.D.N.Y.1971). Judge Croake's original opinion vacated the preliminary injunction. The judge thereafter decided, however, that since the issue was the subject of a pending appeal, he should not, as a matter of discretion, express any opinion on the subject. The opinion was revised accordingly.

4. Thus, the affidavits in support of the motion pointed out that Commerce had been directed by an arbitration award that it had obtained against Vantage, see 486 F.2d at 910 and n.3, to sell the S.S. Barbara in order to minimize damages, that the only outstanding offer at the time was $1,300,000 from a foreign flag operator, and that Vantage said it was still willing to buy the ship for $2,750,000 if it had the "express right to operate SIU."

be obliged to post a bond to cover the full purchase price of the vessel so that Commerce . . . . will not be left in a situation in which recovery against any of the other parties cannot be readily accomplished." The NMU's position was that a large bond was "singularly inappropriate . . . in view of the absence of any meaningful defense to the merits of the action [by the NMU against Commerce]." The panel denied Commerce's motion, but expedited the appeal. Thereafter, another panel reversed the rulings of the district court, vacating the NMU injunction and granting the NLRB a § 10(*l*) injunction. 457 F.2d 1127. Eventually, the NLRB completed the unfair labor practice proceeding and found that the NMU had violated § 8(e) of the Labor Act. The NLRB sought enforcement of its order, which we granted. 486 F.2d 907.

## II

This background brings us to the litigation now before us. From the start, Commerce—later joined by Vantage—has claimed that the NMU's restraint-on-transfer clause was illegal and should not be enforced, and that the NMU was liable to it for damages. Commerce's damage claims were pressed in the form of counterclaims in the suit by NMU against it. Vantage brought its own action in October 1972 against the NMU and Commerce. In June 1973, pursuant to a settlement agreement between Vantage, Commerce and Vernitron, the action was discontinued against Commerce and Vernitron. After our reversal of the injunction obtained by the NMU in its action, Commerce's counterclaims against the NMU in that suit and Vantage's action against the NMU were consolidated and tried without a jury before Judge Thomas P. Griesa. The trial lasted over two weeks; 15 witnesses testified and there were over 1500 pages of transcript.

Commerce and Vantage argued that the NMU was liable for damages on a number of theories. First, the NMU violated Section 1 of the Sherman Act, 15 U.S.C. § 1, in two ways described by the district judge as follows: "(1) That the restraint on transfer clause involved a group boycott against certain potential purchasers of vessels and therefore constituted a *per se* violation; and (2) that the sale and transfer clause was the result of a combination or conspiracy between NMU and large shipping companies to enhance their competitive and financial position at the expense of smaller companies such as Commerce." 411 F.Supp. at 1229. Second, the NMU was liable under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, which by its terms incorporates section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), both of which are reproduced in the margin.[5] Third, Com-

---

**5.** Section 187 reads:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

Section 158(b)(4) reads:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer,

merce and Vantage relied on various other alleged bases of liability: The contract clause violated New York General Business Law, § 340, known as the Donnelly Anti-Trust Act; the NMU wrongfully induced breach of the contract between Commerce and Vantage for the sale of the S.S. Barbara; and the NMU obtained a "wrongful injunction."

Judge Griesa decided all of these claims on the merits except the very first of the two federal antitrust claims. On the second antitrust claim, the judge held in a lengthy opinion that the evidence did not support the view that the restraint-on-transfer clause was the result of a "conspiracy between NMU and large shipping companies to enhance their competitive . . . position at the expense of smaller companies . . . ." The judge also ruled that even though the clause violated section 8(e) of the Labor Act, the NMU was not liable under 29 U.S.C. §§ 158(b)(4) and 187. The former section provides that it shall be an unfair labor practice for a labor union "to threaten, coerce, or restrain any person" with "an object" of "forcing or requiring any employer" to enter into a prohibited agreement or "forcing or requiring any person . . . to cease doing business . . . " with anyone else. The judge held that the NMU did not coerce Commerce into signing the agreement containing the restraint-on-transfer clause. Nor did the NMU coerce Commerce into maintaining the clause, since the NMU did not "strike or threaten to strike" to enforce the provision, but instead "went to arbitration and then to court, . . . [and] resort to a court for a judicial remedy is not coercion." 411 F.Supp. at 1238. Accordingly, the judge found that the NMU did not violate section 8(b)(4) of the Labor Act and

therefore appellants could not recover under 29 U.S.C. § 187. With regard to the other asserted theories of liability, the judge held that the New York State antitrust law was inapplicable, on the authority of *Connell Construction Co. v. Plumbers and Steamfitters Union No. 100,* 421 U.S. 616, 635–37, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), that the NMU was not liable for wrongful inducement of breach of contract because "the proximate cause of the asserted injuries was the preliminary injunction, and the remedy of Commerce and Vantage is limited to the injunction bond," 411 F.Supp. at 1240, and that the NMU's liability for the "wrongful injunction" was limited to the $10,000 bond posted for the benefit of Commerce only.[6]

The only claim that the judge did not decide on the merits was that "the restraint on transfer clause [was] a group boycott against certain potential purchasers of vessels and therefore constituted a per se violation" of the Sherman Act. 411 F.Supp. at 1229. Judge Griesa recognized that this claim raised the preliminary issue whether the clause could be considered exempt from the antitrust laws after the Supreme Court decision in *Connell,* supra. But he decided that it was not necessary to reach that issue, because even if the clause were subject to the antitrust laws and did violate them, the violation would not be "the proximate cause" of the injuries to Commerce and Vantage. The judge found instead that:

> The proximate cause of the delay and final frustration of the S.S. Barbara transactions was the preliminary injunction issued by Judge Frankel in a case admittedly involving close and difficult questions of law. The problem created by the injunction was compounded by the

or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to

make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . .

The "subsection (e)" referred to above is the same section 8(e) which the NLRB and then this court found that the NMU had violated by the restraint-on-transfer clause. 486 F.2d 907.

**6.** Perhaps through oversight, the bond did not cover Vantage.

long delay of Commerce and Vantage in seeking an appellate remedy.

411 F.Supp. at 1239. Accordingly, the judge denied recover "on any theory of antitrust violation." Id.

## III

Judge Griesa cited no authority for the view that one who commits a per se violation of the Sherman Act can be insulated from liability by the injunction bond rule. That rule has its origin in early equity practice. The chancellor had limited authority to award damages directly, but had broad discretion to frame orders granting injunctions. See generally 1 J. Pomeroy's Equity Jurisprudence §§ 1–39, 237(e) (5th ed. 1941). The practice grew up of conditioning the grant of a preliminary injunction on a plaintiff's agreement to post a bond to cover any damages that might result if it were later determined that plaintiff was not entitled to an injunction. See *Russell v. Farley,* 105 U.S. 433, 26 L.Ed. 1060 (1881). The plaintiff, in effect, consented to liability up to the amount of the bond, as the price for it. Otherwise, plaintiff could be found liable for damages only on the theory of malicious prosecution, an action at law. See *Benz v. Compania Naviera Hildago,* 205 F.2d 945, 948 (9th Cir. 1953); 7 Moore's Federal Practice ¶ 65.10[1] at 65.98–99.

■ We recognize the authority of the injunction bond rule, and we have relied on it ourselves. E. g., *In re Spencer Kellogg & Sons,* 52 F.2d 129, 134–35 (2d Cir. 1931). But we do not think it applies to the antitrust claim pressed on the unique facts of this case. The purpose of the injunction bond rule is to provide protection to a defendant who is under injunction in an equity action, but who ultimately prevails on the merits. The rule, however, does not apply to this action at law for damages arising out of a per se antitrust violation. Had Commerce and Vantage brought their actions before the NMU's suit to enforce the restraint-on-transfer clause, their recovery would not have been barred by the intervening wrongful injunction, nor would their damages have been limited to the amount of the bond. We do not believe that their rights are altered because Commerce asserted its antitrust claims as counterclaims in the suit against it, or because Vantage intervened as a defendant in that action and brought its own action for damages after the NMU obtained its wrongful injunction.

■ The NMU argues that it cannot be held liable even if its restraint-on-transfer clause violated the antitrust laws because the district court injunction was a "superseding cause" and because good faith resort to the courts cannot be a basis for liability, citing, e. g., *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). But those cases do not stand for the proposition that a group boycott that is illegal under the antitrust laws can be immunized from liability by a later law suit to enforce it. Indeed, the language in them indicates to the contrary.[7]

It appears that the district judge was led astray by applying the wrong standard for proof of damages in antitrust cases. Proximate cause for an antitrust violation is based on the statutory requirement that the injuries occur "by reason of" the antitrust violation. 15 U.S.C. § 15. We have described the test as

---

**7.** Petitioners, of course, have the right of access to the agencies and courts to be heard . . . . That right, as indicated, is part of the right of petition protected by the First Amendment. Yet that does not necessarily give them immunity from the antitrust laws.

It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. . .

404 U.S. at 513–14, 92 S.Ct. at 613. (Footnote omitted). See also 365 U.S. at 136–37, 81 S.Ct. 523, 5 L.Ed.2d 464.

a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a "material cause" of or a "substantial factor" in the occurrence of damage. *Billy Baxter, Inc. v. Coca-Cola Company,* 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) (citations omitted). By this standard, the execution of the disputed clause and the NMU's determined efforts to enforce it were the proximate cause of injury to appellants, and the notion of superseding cause urged on us by the NMU on appeal is simply inapplicable. Similarly, we have emphasized that the right to recovery under the antitrust laws is given to those in the "target area" of the violation. *SCM Corp. v. Radio Corporation of America,* 407 F.2d 166, 171 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); *Calderone Enterprises Corp. v. United Artists Theater Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Vantage, and other potential buyers of vessels, were the targets of the restraint-on-transfer clause.

■ Finally, we regard the district judge's emphasis on "the long delay of Commerce and Vantage in seeking an appellate remedy" as misplaced. Even if there had been an inexcusable delay, that would be irrelevant to NMU's antitrust liability under the tests referred to above. But even more important, there was no undue delay in seeking appellate relief in this unusual case. After the district court enjoined the sale in March 1971 and an appeal was taken to this court in early April, Commerce and Vantage frantically sought an immediate remedy at the NLRB by pressing the § 8(e) unfair labor practice charge. This was the most effective way of demonstrating that the district court injunction had been improper, and this course proved to be successful. Moreover, as soon as the NLRB issued its complaint on May 24, 1971, Commerce sought to vacate the injunction first in the district court and then in this court, and argued, in the alternative, for an increase in the NMU's bond. Under the circumstances, appellants fol-

lowed a sensible course, and the NMU's efforts, successful at the time, to keep the injunction in force and the bond at an inadequate figure, strengthen rather than weaken appellants' equitable position now.

■ We thus conclude that the district judge committed error in holding that no damages (above the $10,000 bond) could be proved on the claim of a group boycott antitrust violation and in failing to rule on the substance of that claim. The obvious remedy for that error is to remand the case to the district court for it to consider appellant's first antitrust claim on the merits. Appellants, however, ask us to bypass that procedure and to hold that the restraint-on-transfer clause would not be exempt from the antitrust laws under the standards established by *Connell,* supra, and that the agreement constitutes a group boycott and is illegal per se under section 1 of the Sherman Act. See *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Both these assertions raise extremely complex and significant questions on the interaction between the federal labor and antitrust laws. The accommodation of the conflicting policies reflected in these laws has aptly been called "a troublesome and unruly issue." See Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U.Chi.L. Rev. 659 (1965). *Connell* indicates that a "nonstatutory" exemption from the antitrust laws in this case, see 421 U.S. at 622, 95 S.Ct. 1830, turns upon whether the restraint-on-transfer clause was a "direct restraint on the business market . . . that would not follow naturally upon the elimination of competition over wages and working conditions," id. at 625, 95 S.Ct. at 1836, and whether the inclusion of the clause in "a lawful collective-bargaining agreement" shelters the NMU because of the "federal policy favoring collective bargaining". Id. at 626, 95 S.Ct. at 1837. See generally St. Antoine, Connell: Antitrust Law at the Expense of Labor Law, 62 Va.L. Rev. 603 (1976); Note, Supreme Court Term—1974, 89 Harv.L.Rev. 234 (1975). And we do not believe that our prior hold-

ing that the clause violated § 8(e) necessarily determines that antitrust issue, although it lends support to appellants' position. And even if the "nonstatutory" exemption does not apply, there is at least a substantial question whether a per se approach under the antitrust laws is applicable in the case of a non-exempt labor activity.[8] See *Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976), cert. filed, 45 U.S. L.W. 3511 (Jan. 25, 1977); see generally McCormick, Group Boycotts—Per Se or Not Per Se, That Is the Question, 7 Seton Hall L.Rev. 703 (1976) (on the complexity of the per se approach to group boycotts in general). It would, however, be inappropriate for us to decide these issues now without further findings from the district court and briefs on the questions from both parties.[9] See *Connell,* supra, 421 U.S. at 637, 95 S.Ct. 1830. At this point, we are without detailed findings from the district court on the anti-competitive effects of the restraint-on-transfer clause, or in the event that the rule of reason inquiry should apply, on the anti-competitive purposes of the

clause.[10] We therefore remand to the district court for consideration of the merits of the first antitrust claim.

## IV

 We turn now to the district court's dismissal of appellants' claim under § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, see note 5, supra, and its limitation of NMU's liability for wrongful injunction to the amount of the injunction bond. With respect to the claim under § 303, we agree with the judge's determination that "resort to the courts" is not a threat, coercion or restraint under § 8(b)(4)(ii), 29 U.S.C. § 158(b)(4)(ii). See *Retail Clerks Local 770 (Hughes Market, Inc.),* 218 N.L.R.B. No. 84 (1975); cf. *Local Union No. 48 v. Hardy Corp.,* 332 F.2d 682 (5th Cir. 1964). Similarly, the judge correctly limited Commerce's recovery for wrongful injunction to the $10,000 injunction bond posted by NMU. See *Associated General Contractors v. Illinois Conference of Teamsters,* 486 F.2d 972, 974–75 (7th Cir. 1973); *International Ladies Garment Work-*

**8.** This brings us to the question of antitrust liability when union activity is held to be non-exempt. The principal danger of these recent rulings is that a finding of antitrust liability will automatically be made whenever the challenged conduct is held to be non-exempt. This would be a *per se* approach with a vengeance. Arrangements may fall outside the scope of mandatory bargaining and yet have no adverse effect on competition. We still must find whether the agreement restrains trade and whether the restraint is unreasonable. A fair reading of *Jewel Tea* [*Meat Cutters v. Jewel Tea Co., Inc.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).] satisfies me that the Court intended that there be a full-scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust.

Handler, Labor and Antitrust: A Bit of History, 40 Antitrust L.J. 233, 239–40 (1971). Cf. *Jacobi v. Bache & Co., Inc.,* 520 F.2d 1231, 1238–39 (2d Cir. 1975), cert. denied, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976).

**9.** On appeal, the NMU's brief did not discuss the antitrust claim at issue here, presumably because the district court did not reach it. Also, in their complaint and their briefs in this court, Commerce and Vantage have argued that the alleged group boycott was illegal per se. If, on remand, the district court determines

that the rule of reason theory should apply, appellants should be allowed to press their claim of a group boycott antitrust violation under that theory.

**10.** We realize that the district court has already determined that the restraint-on-transfer clause was not the result of a conspiracy between the NMU and the large shipping companies to enhance their competitive position. Our remand on the issue of an illegal group boycott does not disturb that finding, but by the same token, the finding does not foreclose full examination of appellants' group boycott claim. We note that in *Connell,* "[t]here was no evidence that Local 100's organizing campaign was connected with any agreement with members of the multiemployer bargaining unit . . . ." 421 U.S. at 625 n.2, 95 S.Ct. at 1836. The Court nonetheless considered the multiemployer bargaining agreement as "relevant in determining the effect that the agreement between Local 100 and Connell would have on the business market." Id. at 623, 95 S.Ct. at 1835. The same considerations apply in this case. Although the district court found no conspiracy between the NMU and the large shipping companies to injure the smaller companies, it must still evaluate the agreement between the NMU and the shipping companies for its effect on the market.

*ers Union v. Donnelly Garment Co.,* 147 F.2d 246 (8th Cir.), cert. denied, 325 U.S. 852, 65 S.Ct. 1088, 89 L.Ed. 1972 (1945); but see *United States Steel Corp. v. United Mine Workers,* 456 F.2d 483 (3d Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972).

Accordingly, we affirm the court's dismissal of appellants' claims under § 303 of the Labor Management Relations Act and its limitation on the recovery for wrongful injunction, but reverse its dismissal of appellants' claim of a group boycott in violation of section 1 of the Sherman Act and remand for further consideration.

LUMBARD, Circuit Judge (concurring in part and dissenting in part):

I agree with my brothers that any limitation of recovery under the injunction bond rule does not bar full recovery for violation of the antitrust laws.[1] But I disagree with my brothers' failure to find that there has been a violation of the antitrust laws since the record made in the court below furnishes ample basis for such a determination. In my view, it remains only for the district court to assess the damages and enter judgment.

*Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 634, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) squarely rejected the argument that § 303 of the LMRA provided the exclusive employer remedy for violations of the "hot cargo" prohibition of § 8(e) of the National Labor Relations Act ("NLRA"), 28 U.S.C. § 158(e). In determining whether to apply labor's nonstatutory exemption, the Court observed that "labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions[,]" 421 U.S. at 622, 95 S.Ct. at 1835, but an agreement between a union and a nonlabor party which restrains competition in any other manner is not immune, 421 U.S. at 622–23, 95 S.Ct. 1830; see *Mine Workers v. Pennington,* 381 U.S. 657, 662, 85 S.Ct. 1585 (1965); *Allen Bradley Co. v. Electrical Workers,* 325 U.S. 797, 806–11, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). In applying these standards to the facts before it, the *Connell* Court analyzed the agreement in issue in terms of § 8(e) of the NLRA. Although the union argued that the agreement was saved by reason of the construction industry proviso to § 8(e), the Court disagreed and found it to be an illegal secondary boycott.

Once the Court reached the § 8(e) issue it deemed it unnecessary to engage in further scrutiny but concluded that the union was not immunized from antitrust liability. 421 U.S. at 634–35, 95 S.Ct. 1830. I believe that inasmuch as the National Labor Relations Board ("NLRB"), 196 NLRB No. 165 (1972), and this court, 486 F.2d 907 (2d Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), have adjudicated the NMU restraint-on-transfer clause and efforts at its enforcement to be a violation of § 8(e), there is no need for us or for the district court to re-examine this record. See *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 483 F.2d 1154, 1179 (5th Cir. 1973), *rev'd,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (dissenting opinion of Circuit Judge Clark).

Implicit in our prior decision enforcing the Board's order was an acceptance of its finding that the restraint-on-transfer clause prevented Commerce from selling the S.S. Barbara to Vantage, 486 F.2d at 911.[2] We also ruled that the *National Woodwork*

---

[1]. It seems to me there is considerable doubt of the continued validity of the limitation of recovery for wrongful injunction to the amount of the bond. See Metzger & Friedlander, The Preliminary Injunction: Injury Without Remedy? 29 Bus.Law. 913 (1974); Note, Interlocutory Injunctions and the Injunction Bond, 73 Harv.L.Rev. 333 (1959); and Note, Recovery of Damages on Injunction Bonds, 32 Colum.L. Rev. 869 (1932). However, as appropriate recovery should be available for violations of the antitrust laws, no purpose would be served by further examination of that question.

[2]. The district court's opinion arrives at the same basic finding but for its legal conclusion which we today reject that the NMU's resort to arbitration and the ensuing injunction were nonactionable superseding causes. 411 F.Supp. at 1239.

standards were met since the clause was not "addressed to the labor relations of the contracting employer *vis-à-vis* his own employees", 486 F.2d 912, *quoting National Woodwork Mfgrs. Ass'n v. NLRB,* 386 U.S. 612, 645, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). These two conclusions are sufficient to meet the *Connell* standard that the clause have "a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions." 416 U.S. at 635,[3] 95 S.Ct. at 1841.

The majority suggests that inclusion of the clause in "a lawful collective-bargaining agreement" might save it from antitrust scrutiny, at 801, *quoting Connell,* supra 421 U.S. at 626, 95 S.Ct. 1830. But that argument has no application to the facts before us since we have already ruled that portion of the collective-bargaining agreement to be unlawful as violative of § 8(e).

The record before us requires a finding of liability on either a per se or rule-of-reason analysis of the NMU's actions.[4] Under the per se approach a well-meaning purpose will not insulate a group boycott from liability, see *Fashion Originators Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and its anticompetitive effect will be presumed, see *Northern Pacific Railway v.*

*United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).[5] Under the balancing approach of the rule of reason, examination of the facts of this case indicates that the anticompetitive effects of this particular agreement outweigh any legitimate collective bargaining concerns.

Judge Griesa's 58 page opinion carefully traced the bargaining practices in the shipping industry and found that the restraint-on-transfer clause had its genesis in complaints made by Joseph Curran, president of the NMU, in a January 22, 1968 letter to Edward Silver concerning the loss of NMU-represented vessels through sale and transfer. Silver, who testified at trial, was the lawyer and chief negotiator for the two major shipping owners associations, the Tankers Service Committee ("TSC") and the Maritime Service Committee ("MSC"). The restraint-on-transfer clause was first successfully negotiated into a collective-bargaining agreement by the Maritime Engineers Beneficial Association ("MEBA"), a non-competing union, in a May, 1968 amendment to its contract with MSC. Judge Griesa found this version of the restraint-on-transfer clause to be the model for the NMU clause. The district judge found the purpose of the clause to have been memorialized in the following portion of a June 25, 1969 letter from J. M. Calhoon, president of MEBA to Silver:

> The original and continuing purpose of said Memorandum is: To preserve the jobs and job rights of the Company's

---

**3.** This view is fully consistent with the thoughts of Professor Handler whose comments are favorably cited by the majority:

> To me the test should be this: Whatever is required or expressly authorized under existing labor legislation should be exempt from the antitrust laws. And whatever is mandatory should be determined in the light of our national labor policy, which should override any countervailing antitrust considerations. Handler, Labor and Antitrust: A Bit of History, 40 Antitrust L.J. 233, 238 (1971).
>
> Perhaps a finding of no exemption entails a preliminary appraisal of the nature and merits of the underlying antitrust claim, but it does not necessarily follow that the labor organization will be found liable on that claim. "Exemption and liability are not co-extensive concepts." *Id.* at 237. The removal of the shroud

of immunity simply means that the union must answer to the charge of violating the antitrust laws.

**4.** In a post-*Connell* decision, the Eighth Circuit has found the per se approach to be inapplicable to a group boycott arising out of a labor agreement. See *Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976), cert. filed, 45 U.S.L.W. 3511 (Jan. 25, 1977). A rule of reason inquiry in the context of a labor boycott might well be an appropriate means to balance the goals of the antitrust laws with the positive values of collective-bargaining.

**5.** For a recent and thorough review of this subject see McCormick, Group Boycotts—Per Se or Not Per Se, That Is the Question, 7 Seton Hall L.Rev. 703 (1976).

engineers covered by our collective bargaining agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such engineers under said Agreement.

411 F.Supp. 1224, 1233 (S.D.N.Y.1976). The clause was subsequently adopted without significant discussion in the NMU's 1969 collective-bargaining agreement.

*Allen Bradley Co.,* supra at 798, forecloses any argument that a labor agreement is not unreasonable simply because its general purpose is "to get and hold jobs for [the union members] at good wages and under high working standards". As we noted in our prior decision, the NMU's interest in job preservation was not directed at the crew members of the S.S. Barbara since it is the union's practice to strip a ship of its crew when it is sold and to have it remanned from the hiring halls. 486 F.2d at 914.

The anticompetitive effect of the restraint-on-transfer clause is also apparent from the record before us. Its most immediate impact was to thwart the sale of the S.S. Barbara to Vantage, cause the cancellation of the lucrative SoCal charter, and virtually force the sale of the vessel for scrap. Beyond that, the clause prohibits shipowners from selling their vessels to United States Flag operators unless the prospective buyer agrees to enter into an NMU collective-bargaining agreement. Owners are effectively prevented from selling to a potential buyer whose employees are presently represented by the NMU's rival, the Seafarer's International Union ("SIU"). Sales are, therefore, limited to foreign flag operators, non-SIU operators, or those who would buy for scrap value. Mergers between small NMU represented owners and small SIU represented owners are foreclosed. By encouraging sales to foreign flag owners, the clause lessens competition among the American owners.

In summary, whether the appropriate inquiry is under a rule of reason or the per se measure, the record requires a finding that the Union must be held responsible for violation of the antitrust law.

I would hold that the NMU has violated § 1 of the Sherman Act, 15 U.S.C. § 1, and remand to the district court solely for determination of damages.